**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**PEARLIE McCULLOUGH, as grandmother**
**and personal representative of the estate of**
**her grandson, Marquell Deontae**
**McCullough, deceased,**

    **Plaintiff,**

v.                                                                            Case No.  8:06-cv-813-T-30TBM

**JIM COATS as Sheriff of Pinellas County,**
**Florida, in his official capacity, et al.,**

    **Defendants.**
_____/

# ORDER

THIS CAUSE comes before the Court upon the Motion of Defendants Antolini and DeLeon for Summary Judgment (Dkt. #25), Motion of Defendant Coats for Summary Judgment and Supporting Memorandum of Law (Dkt. #26), and Plaintiff's Consolidated Response in Opposition to Defendants' Motions for Summary Judgment (Dkt. #30).  The Court, having considered the motions, response, affidavit, exhibits, and being otherwise advised in the premises, concludes that Defendants' motions for summary judgment should be denied.

**I.**    **Summary Judgment.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. Northern Crossman Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322; *Hilburn v. Murato Electronics North America, Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). If there is a conflict in evidence, the non-moving party's evidence is to be believed and all reasonable inferences must be drawn in favor of the non-moving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).

**II.    Factual Background**.

These are the facts presented by Deputy John Syers, Jr. ("Syers"), Corporal David Antolini ("Antolini"), and Deputy Nelson DeLeon ("DeLeon") concerning the circumstances surrounding the shooting and death of an eighteen year old, African-American male named Marquell Deontae McCullough ("McCullough"). McCullough died at the scene. During a

review of the facts presented to the Court for summary judgment purposes, the Court observed several discrepancies between the investigator's reports, affidavits and depositions of the officers involved. Such discrepancies will be identified herein.

Approximately 1:30 a.m. on the morning of May 2, 2004, an undercover officer named Deputy John Syers, Jr. ("Syers") observed a white truck parked in the parking lot of the LaQuinta Inn on 34th Street North in Pinellas County. Syers received information about possible drug activity in the area. As a white truck left the parking lot, Syers observed the tint on the truck's windows and concluded that it was too dark and violated Florida law. Syers then radioed the truck's license tag information and told Corporal David Antolini ("Antolini") and Deputy Nelson DeLeon ("DeLeon") that there was probable cause to conduct a traffic stop of the truck because of the excessive tint on its windows. Antolini followed the truck as it stopped at a traffic light at the intersection of 38th Avenue North and 34th Street North. DeLeon pulled behind the vehicles driven by McCullough and Antolini while the traffic light was red. When the light turned green, McCullough accelerated heading south on 34th Street North. Antolini and DeLeon activated their emergency lights and sirens. The officers followed the truck. McCullough did not immediately pull over, but instead accelerated up to approximately 60 m.p.h. After the truck went through the intersection of 22nd Avenue North, it turned left into a shopping center parking lot. Antolini and DeLeon followed the truck into the parking lot.

After driving into the parking lot, the truck fish-tailed and spun around. After the truck spun around, it was stopped facing Antolini's cruiser at an approximate 45-degree

angle and was only a few feet away from the cruiser. Antolini exited his vehicle, drew his firearm, and walked to the front of his cruiser. In Antolini's affidavit offered in support of his motion for summary judgment (Dkt.#25-2, paragraph 10), Antolini stated, "I was able to make eye contact with the driver of the truck."[1] Pointing his firearm at the driver of the truck, Antolini yelled for him to show his hands. The driver of the truck did not show his hands, but instead tried to drive around Antolini's cruiser.

In the meantime, DeLeon had driven into the shopping center parking lot, passing the right side of Antolini's cruiser. According to DeLeon's statement to SAO investigators (Dkt. #31-3):

> Deputy DeLeon was coming in a 'little fast' as the parking lot was wet from a recent rain. Deputy DeLeon believes his vehicle skidded a little. The suspect was coming forward, off to the right side of Cpl. Antolini's cruiser. Deputy DeLeon's vehicle struck the suspect vehicle. He believes the suspect vehicle was coming forward as well at contact.
>
> While the 2 vehicles were contacting each other, Deputy DeLeon realized he was pinned inside the car. Through his side window, he saw the suspect vehicle's headlight and grill area. He heard the truck's engine revving and thought he could hear its tires spinning.[2]

---

[1] This statement by Antolini directly conflicts with his statement to Detective Tim Grundmann on the night of the shooting. The Detective Grundmann's report states: "Cpl. Antolini exited the vehicle. This was so he could attempt to see the occupant(s) through the windshield as the window tint was jet black. He still could not see the occupant(s)."

[2] This statement is inconsistent with DeLeon's later statements in his affidavit offered in support of summary judgment and his deposition testimony. In paragraph 11 of DeLeon's affidavit (Dkt. #25-2), DeLeon stated, "The truck accelerated toward my cruiser and rammed the driver-side door of the car." On page 4, line 7 of DeLeon's deposition (Dkt. #30-18), in response to a question regarding DeLeon's contact with McCullough's truck, DeLeon stated, "I was being rammed, sir."

DeLeon said he yelled to Antolini that he was "stuck". DeLeon has stated that he was in fear of his personal safety and wanted to protect himself, so he drew his firearm and fired one shot toward the truck's windshield through his closed driver's window of his cruiser.

In the meantime, Antolini saw the truck accelerate forward and collide with DeLeon's cruiser. Antolini heard DeLeon yelling, but could not understand what he was saying. Antolini has stated that he fired three rounds into the windshield of McCullough's truck because he feared for DeLeon's safety. The truck stopped, went into reverse, and again spun its tires. In his affidavit, Antolini said that he saw the truck back away from DeLeon's cruiser and its front wheels swung around in his direction. He said he fired another round in the direction of the truck's windshield and then he had "to leap onto the hood" of his cruiser to avoid having his legs crushed.[3] The truck struck Antolini's cruiser at the front passenger corner.

As the truck again moved westward away from Antolini and DeLeon, Antolini and DeLeon followed the truck on foot and fired more rounds at the passenger side of the vehicle.[4] Antolini told SAO investigators that he remembered telling DeLeon to "watch your

---

[3] This statement conflicts with Antolini's statement to SAO investigators. The SAO report states that "The truck started spinning its tires again and came directly at Cpl. Antolini. Cpl. Antolini had to retreat, was struck by the truck, pushed off the truck's hood and ended up on the hood of his cruiser." *See* Dkt. #31-2. The record reflects that Antolini did not require medical treatment after the shooting. The record also reflects that the damage to Antolini's cruiser was limited to some paint transfer from the white truck to the right front bumper of Antolini's cruiser. *See* Dkt. #31-2.

[4] Both officers have stated that they were able to move along with the truck on foot and discharge rounds into the passenger side of the truck. Nevertheless, both officers have also stated that they did not know where the shots were coming from or where each other were at the time of following the truck on foot. Such statements appear to be inconsistent. If both officers were moving along with the truck on the
(continued...)

crossfire". He was not sure where DeLeon was standing at the time. DeLeon also told SAO investigators that he was on foot moving along with the truck as it continued away from the cruisers. DeLeon told SAO investigators that the truck was moving at a "slow speed across the parking lot." DeLeon also fired several more rounds while on the passenger side of the truck. DeLeon told SAO investigators that he heard gun shots and thought they were coming from the truck, so he fired. DeLeon also told SAO investigators that he had no idea where Antolini was at this time, but he remembered Antolini saying something about "watch your crossfire."[5] *See* Dkt. #31-3.

The truck rolled to a stop when it entered a shallow ditch at the edge of the parking lot. In DeLeon's statement to SAO investigators, DeLeon noted that a taxi cab was in the direct path of the truck before the truck finally came to rest.[6] Antolini and DeLeon reloaded and approached the front of the truck around the passenger side while keeping it covered

---

[4](...continued)
passenger side of the truck while simultaneously shooting at the truck's driver, then they would have been shooting and/or jogging within several yards of each other.

[5] This statement directly conflicts with DeLeon's deposition testimony. On page 24, lines 7-16 of DeLeon's deposition (Dkt. #30-18), the deposition reads:
Q: Now do you recall Corporal Antolini saying, "Watch your crossfire," or "Watch for crossfire?"
A: No, I don't recall that, sir.
Q: Do you recall him saying anything as the truck made its westward way out of the parking lot area?
A: I didn't know where he was, sir. I didn't hear anything, sir.
Q: Okay. You didn't hear anything? You didn't [sic] Corporal Antolini say anything?
A: No, sir.

[6] A taxi cab driver named Thomas Bowen (an ex-police officer) noticed the two police cruisers pursuing McCullough's white pickup truck in the parking lot. Bowen saw the truck driving "out of the box" and away from the police cruisers. Bowen decided to stop his taxi cab directly in the truck's path in the effort to help the police. *See* Dkt. #30-9. McCullogh's truck rolled to a stop before reaching the parked taxi cab.

with their firearms. Antolini called on the radio that shots had been fired and requested rescue. Paramedics arrived shortly thereafter and Mr. McCullough was pronounced dead.

According to the medical examiners report (Dkt. #30-8), Mr. McCullough's cause of death was multiple gunshot wounds. Nine bullets struck Mr. McCullough. One shot, traveling back to front, struck him in the head. A second round struck Mr. McCullough in the right shoulder; the path of this bullet was back to front, right to left, and slightly down. A third bullet struck the right side of Mr. McCullough's back, and a fourth round struck the back of his right arm, having traveled right to left, back to front, and slightly downward. A fifth gunshot also struck the back of Mr. McCullough's right arm, having traveled slightly back to front, and downward. A sixth bullet also struck Mr. McCullough in his back, and its path was back to front. A seventh bullet entered the front of Mr. McCullough's right arm, and its route was front to back. An eighth bullet also struck Mr. McCullough in his right arm, traveling right to left. The ninth bullet struck Mr. McCullough's leg just above the right knee, also having traveled from right to left.

A Pinellas County Sheriff's Office detective was assigned to document the location of the spent shells. He determined that nine (9) shots had been fired from Antolini's gun and six (6) shots has been fired from DeLeon's gun. The detective also determined that all shells were from guns possessed by the officers. Mr. McCullough was unarmed.

**III.    Applicable Principles.**

    **A.    Section 1983 Principles.**

Title 42 U.S.C. § 1983 imposes on any person who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws.  To establish a claim under 42 U.S.C. § 1983, plaintiffs must allege and ultimately prove that (1) defendant deprived them of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law.  *Arrington v. Cobb County*, 139 F.3d 865, 872 (11th cir. 1998).  In addition, plaintiffs must allege and establish an affirmative casual connection between the defendants' conduct and the constitutional deprivation.  *Troupe v. Sarasota County, Florida*, 419 F.3d 1160, 1165 (11th Cir. 2005).

    **B.    Fourth Amendment Principles.**

An excessive force claim must be analyzed under the Fourth Amendment and its objective reasonableness standard.  *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); *Graham v. Connor*, 490 U.S. 386, 395 (1989).[7]  The legal principles concerning the use of deadly force are well established: The Fourth Amendment protects individuals from "unreasonable" seizures, and encompasses the right to be free from the use of excessive force during a seizure.  To establish a Fourth Amendment claim based on the use of excessive force, plaintiffs must show that a seizure occurred and that the force used to effect the seizure was unreasonable.  Deadly force is "reasonable" for purposes of the Fourth Amendment when an

---

[7] Plaintiff has no freestanding Fourteenth Amendment claim because the decedent was "seized" at the time he was struck by the deputy's bullet.  *Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003).

officer: (1)(a) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, or (b) if the suspect threatens the officer with a weapon or there is probable cause to believe that he had committed a crime involving the infliction or threatened infliction of serious physical harm; and (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). All of these conditions must be met or the use of deadly force is unconstitutional. *Harris v. Coweta County, Ga.*, 406 F.3d 1307, 1314 (11th Cir. 2005).

The reasonableness inquiry in an excessive force claim is an objective one, made in light of the facts and circumstances confronting the officer and without regard to the officer's underlying intent or motivation. *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005). While the facts are viewed in the light most favorable to plaintiffs, the determination of reasonableness is made from the perspective of the officer. *Id.*

Notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. *Garner*, 471 U.S. 1, 9. The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. In *Garner*, the U.S. Supreme Court reasoned:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always

justify killing the suspect. A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead.[8]

## C.   Qualified Immunity Principles.

Plaintiffs can only establish a claim under the Fourth Amendment against the deputies in their individual capacities if the deputies are not entitled to qualified immunity. *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). To be eligible for qualified immunity, defendants must first prove they were acting within the scope of their discretionary authority when the allegedly wrongful act occurred. *Mercado*, 407 F.3d at 1156. If this is shown, the burden shifts to plaintiffs to show that qualified immunity is not appropriate. *Mercado* at 1156.

The court conducts a two-part inquiry to determine whether qualified immunity is appropriate. *Harris*, 406 F.3d at 1313-14. First, the court determines whether the summary judgment facts, viewed in a light most favorable to plaintiffs, show that the officer's conduct violated a constitutional right. *Brosseau*, 543 U.S. 197; *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The second inquiry is whether, at the time of the violation, the constitutional right was clearly established in light of the specific context of the case, not simply as a broad proposition. *Brosseau*, 543 U.S. 199-200. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau* at 199.

---

[8] *Garner* at 11.

**IV.     Discussion.**

    **A.     Count I - § 1983 Claim Against Antolini and DeLeon.**

Defendants, Antolini and DeLeon, move for summary judgment as to Plaintiff's §1983 claim, alleging unreasonable seizure and use of excessive force in violation of the Fourth and Fourteenth Amendments. Defendants argue that as governmental actors, they are entitled to the protection of qualified immunity. Defendants also argue that deadly force was necessary in order to protect themselves as well as third party bystanders (such as the taxi cab driver) from serious bodily harm. Plaintiff argues in response that no reasonable officer under the circumstances could conclude that deadly force was appropriate to seize McCullough in order to give him a traffic violation for dark tinting on his windows.

        **1.     Discretionary Function.**

It is undisputed that Antolini and DeLeon were acting within the scope of their authority as police officers when the shooting at issue occurred. Thus, in order to overcome summary judgment the burden is on Plaintiff to show that Antolini and DeLeon's actions violated clearly established constitutional law.

        **2.     Violation of Constitutional Right.**

Initially, Antolini and DeLeon sought to pull McCullough over in order to issue a civil violation for the tinting on his windows. It is apparent that this was meant to be a pre-textual stop in order to search McCullough's vehicle for drugs or ask him questions regarding possible drug activity at the LaQuinta Inn. Although McCullough resisted the stop, such behavior by itself hardly justifies the use of deadly force. Under the facts of this case, the

question of the objective reasonableness of Antolini's and DeLeon's use of deadly force first arises at the moment of collision between McCullough's truck and DeLeon's cruiser. DeLeon's statement to investigators on the night of the shooting, states, in pertinent part:

> Deputy DeLeon was coming in a "little fast" as the parking lot was wet from a recent rain. Deputy DeLeon believes his vehicle skidded a little. The suspect was coming forward, off to the right side of Cpl. Antolini's cruiser. Deputy DeLeon's vehicle struck the suspect vehicle. He believes the suspect vehicle was coming forward as well at contact.
>
> While the 2 vehicles were contacting each other, Deputy DeLeon realized that he was pinned inside the car. Through his side window, he saw the suspect vehicle's headlight and grill area. He heard the truck's engine revving and thought he could hear the tires spinning. He felt that the suspect was trying to do further harm to him.
>
> * * *
>
> He was in fear of being injured and/or killed, so he drew his firearm and fired. He was not sure of the number of shots he fired but thought it was probably 1 through his side window. The truck backed up and he was a little unsure of the truck's path from here.[9]

These facts, considered in the light most favorable to Plaintiff, raise a genuine issue of material fact as to McCullough's complicity in raising the level of aggression during the short car chase. From a reading of DeLeon's initial description of the collision, DeLeon indicated that he was coming in too fast on a wet parking lot and that <u>his</u> cruiser collided into McCullough's truck while McCullough's truck was already traveling in a forward motion. In other words, the collision between McCullough and Deleon could be described as an "accident" rather than a "ramming." Under Plaintiff's version of the facts, McCullough was simply trying to evade capture, rather than attempting to inflict physical harm upon the

---

[9] Dkt. #31-3.

officers. A reasonable jury could find, under Plaintiff's version of the facts, that at the time of the first instance of deadly force (the first shot by DeLeon) DeLeon did not have probable cause to believe that McCullough posed a threat of serious physical harm to DeLeon. Even if it is determined that it was reasonable for DeLeon to make the one shot out of his driver's window, there remains a question of whether the use of deadly force thereafter was objectively reasonable.

Furthermore, the Court concludes that there are several other sets of material facts at issue upon which a reasonable jury could also find that the use of continued deadly force was not necessary to prevent escape or to prevent serious physical harm upon the officers or others.[10] First, whether Antolini was able to see McCullough through the windshield when he initially stopped him in the parking lot. Second, whether there was sufficient time for the officers to give some warning about the possible use of deadly force prior to opening fire. Third, whether Antolini told DeLeon to "watch his crossfire." Fourth, whether it is conceivable that Antolini and DeLeon "did not know where each other were" when following the truck on foot, despite their statements that they were both moving along on foot with the truck on the passenger side while continuing to discharge their firearms. Finally, whether McCullough's truck was close enough to the taxi cab to be considered a danger to a third party bystander.

---

[10] Where, as here, the resolution of disputed facts determines on which side of this line the officers' conduct fell, summary judgment is inappropriate. *See Skop v. City of Atlanta, G.A.*, 485 F.3d 1130, 1144 (11th Cir. 2007) (the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied).

While a court is "loath to second-guess the decisions made by police officers in the field," this Court cannot conclude as a matter of law that a reasonable jury could not find that DeLeon and Antolini's actions were unreasonable under the standards for using deadly force articulated in *Garner*.[11]

### 3. Clearly Established Right.

The second issue is whether the constitutional right was clearly established as of May 2, 2004; in other words, whether it would be clear to an objectively reasonable officer that DeLeon and Antolini's conduct was unlawful. *Vaughan*, 343 F.3d at 1332. Plaintiff must point to law which pre-dates the incident and, if case law, be from the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida. *Mercado*, 407 F.3d at 1159. In the qualified immunity context, an officer will be entitled to qualified immunity if he had arguable probable cause to employ deadly force, i.e., if the officer reasonably could have believed that probable cause existed to use deadly force. *Vaughan*, 343 F.3d at 1332.

Officers have been on notice since 1985 that deadly force would be justified only by a reasonable belief that they or the public were in imminent danger. *Garner*, 471 U.S. at 3. Moreover, Florida Statute §776.012 only allows for the use of deadly force if a person reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony. "Where the suspect poses no immediate threat to the officer and no threat to others,

---

[11] *See Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003).

the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. 1, 11. "A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead." *Id.*

Taking the facts in the light most favorable to Plaintiff, the Court concludes that it is a question for the jury to decide whether an objectively reasonable officer in DeLeon's shoes could have reasonably believed that deadly force was necessary to protect himself at the point of the initial collision between McCullough's truck and DeLeon's cruiser. The Court further concludes that a jury should also decide whether Antolini and DeLeon's actions of continuing to shoot at McCullough while the truck was attempting to reverse (Antolini - 3 shots) and while following on foot as McCullough's truck rolled away at a slow speed (Antolini and DeLeon - a combined 11 more shots from the side and back), constitute an excessive use of deadly force.

For these reasons, the Court concludes that DeLeon and Antolini are not entitled to qualified immunity as to Count I, and summary judgment is denied as to Count I.

**B. Count II - Supplemental Wrongful Death Action Against Sheriff Jim Coats, In His Official Capacity.**

In Count II, Plaintiff asserts a claim against Defendant, Sheriff Jim Coats, in his official capacity ("Sheriff Coats"), for wrongful death under Florida Statute §768.19, which states in pertinent part:

> When the death of a person is caused by the wrongful act, negligence, default or breach of contract or warranty of any person...and the event would have entitled the person injured to maintain an action and recover damages if death

had not ensued, the person...that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured, although death was caused under circumstances constituting a felony.[12]

Sheriff Coats argues that Count II is barred bar §776.05, *Florida Statutes* and that the Sheriff is immune from suit under §776.085. Section 776.05, *Florida Statutes* provides:

> A law enforcement officer. . .need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of any force:
> (1) Which he or she reasonably believes to be necessary to defend himself or herself from bodily harm while making the arrest; . . .
> \* \* \*
> (3) When necessarily committed in arresting felons fleeing from justice. However, this subsection shall not constitute a defense in any civil action for damages brought for the wrongful use of deadly force unless the use of deadly force was necessary to prevent the arrest from being defeated by flight and, when feasible, some warning had been given, and:
> > (a) The officer reasonably believes the fleeing felon poses a threat of death or serious physical harm to the officer or others; or
> > (b) The officer reasonably believes that the fleeing felon has committed a crime involving the infliction or threatened infliction of serious physical harm to another person.[13]

Section 776.085(1), *Florida Statutes* provides:

> It shall be a defense to any action for damages for personal injury or wrongful death, or for injury to property, that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony. The defense authorized by this section shall be established by evidence that the participant has been convicted of such forcible felony or attempted forcible felony, or by proof of the commission of such crime or attempted crime by a preponderance of the evidence.

---

[12] Section 768.19, *Florida Statutes*.

[13] Sections 776.05(1) and (3)(a) and (b), *Florida Statutes*.

As discussed above, the Court concludes that a reasonable jury could find, under Plaintiff's version of the facts, that at the time of the shooting DeLeon and Antolini did not have probable cause to believe that McCullough posed a threat of serious physical harm to DeLeon, Antolini, or others; or that McCullough committed a forcible felony or a crime involving the infliction or threatened infliction of serious physical harm to another. Accordingly, the Court declines to grant summary judgment as to Count II based on §776.05 or §776.085, *Florida Statutes*.

It is therefore ORDERED AND ADJUDGED that:

1. Motion of Defendants Antolini and DeLeon for Summary Judgment (Dkt. #25) is **DENIED**.

2. Motion of Defendant Coats for Summary Judgment and Supporting Memorandum of Law (Dkt. #26) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida on December 28, 2007.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2006\06-cv-813 msj 25 and 26.frm